IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Eileen Finegan, | ) | No. CV 07-693-TUC-FRZ |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| AUTOTRANSPORTES TUFESA S.A. de | ) | |
| C.V., a foreign corporation; TUFESA | ) | |
| U.S.A., L.L.C., an Arizona Corporation,, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Pending before the Court is Defendant Tufesa U.S.A. L.L.C.'s ("Tufesa USA") motion for summary judgment and Autotranportes Tufesa S.A de C.V.'s ("Autotransportes Tufesa") motion to dismiss for lack of personal jurisdiction. For the reasons stated below, both motions are denied.

**STANDARD OF REVIEW: SUMMARY JUDGMENT**

Summary judgment is appropriate where "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either

1   way." *Id.*  Thus, the "mere scintilla of evidence" in support of the nonmoving party's claim

2   is insufficient to defeat summary judgment.  *Id.* at 252.  However, in evaluating a motion for

3   summary judgment, "the evidence of the nonmoving party is to be believed, and all

4   justifiable inferences are to be drawn in his favor."  *Id.* at 255 (emphasis added).  Further,

5   a court "[must] not weigh the evidence[, make credibility determinations,] or determine the

6   truth of the matter" at the summary judgment stage, but may only determine whether there

7   is a genuine issue for trial.  *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th

8   Cir.1996); *Balint v. Carson City, Nevada*, 180 F.3d 1047, 1054 (9th Cir. 1999); *see also*

9   *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322,

10  1328 (9th Cir. 2000) (recognizing that on a motion for summary judgment, "a district court

11  is entitled neither to assess the weight of the conflicting evidence nor to make credibility

12  determinations")

13  **BACKGROUND**

14      On July 9, 2007, Plaintiff Eileen Finegan purchased a bus ticket from Autotransportes

15  Tufesa in Guadalajara, Mexico for non-stop, direct[1] bus transportation to her home in

16  Tucson, Arizona.  Ms. Finegan was never advised that a different bus company would

17  provide a portion of her bus travel, or that a different bus driver from a wholly separate bus

18  company would take control of the bus at the border to complete the trip during the U.S.

19  portion of the bus trip.  On July 10, 2007, while driving in Mexico en route to Tucson, the

20  Autotransportes Tufesa bus transporting Plaintiff along with other passengers plunged off

21  a highway near Benjamin Hill in Sonora, Mexico resulting in the deaths of several passengers

22  and injuries to many other passengers.  Subsequent to the accident, the driver of the bus, C.

23  Faustino Portugal Garcia, was fired.   Plaintiff was injured in the accident and brought suit

24  against Autotransportes Tufesa and Tufesa USA based on the injuries she sustained in the

25

26  _____

27      [1]Direct inasmuch as the customer can buy one ticket from Mexico to Arizona without having
    to get off the bus at the border, buy a new ticket, wait for another bus to arrive, and then board a new
28  bus to actually reach their international destination.

1   bus crash.  Plaintiff argues that Autotransportes Tufesa and Tufesa USA are jointly liable for

2   her injuries.

3   **DISCUSSION**

4       Tufesa U.S.A. argues that Autotransportes Tufesa is the only named defendant that

5   actually could be legally at fault in this case; as Tufesa U.S.A. asserts that it is a totally

6   independent and separate corporation from Autotransportes Tufesa, Tufesa USA asserts that

7   it can not be held legally responsible for the separate tortuous acts of Autotransportes Tufesa.

8   Tufesa U.S.A. argues that Plaintiff only purchased a bus ticket from Autotransportes Tufesa

9   in Mexico, that Plaintiff boarded Autotransportes Tufesa's bus in Mexico, that the driver of

10  the bus in question was only a Mexican employee of Autotransportes Tufesa, and that the bus

11  crash and injuries to Plaintiff all occurred in Mexico while Plaintiff was an occupant in

12  Autotranportes Tufesa's bus.  Accordingly, Tufesa U.S.A. argues that it can not be held

13  directly liable to Plaintiff for negligence as it owed no duty to her.  Likewise, Tufesa U.S.A.

14  further argues that it can not be held liable for the acts of Autotransportes Tufesa based on

15  a piercing the corporate veil, instrumentality, alter-ego, or unity of interest type theory as

16  Tufesa U.S.A. and Autotransportes Tufesa are totally separate corporations that can not be

17  held liable for the actions of the other corporation.  For example, in arguing that the two

18  corporations are totally independent of each other, Tufesa U.S.A. argues that: Tufesa U.S.A.

19  is not the parent corporation of Autotransportes Tufesa; that the two corporations do not have

20  any ownership interests in each other; the controlling shareholders of Autotransportes Tufesa

21  do not control Tufesa U.S.A.; Tufesa U.S.A. is an Arizona corporation that provides bus

22  services only in the United States while Autotransportes Tufesa is a Mexican corporation that

23  only provides bus services in Mexico; both corporations have separate business addresses

24  (Tufesa U.S.A. in Arizona and Autotransportes Tufesa in Mexico); both corporations observe

25  their own corporate formalities by holding separate meetings and keeping minutes; both

26  corporations maintain their own financial records, have separate banking accounts, pay their

27  own expenses and salaries, buy their own uniforms, and hire their own employees;

28  Autotransportes Tufesa has a distinct administrative board; both companies have separate

1   management; bus ticket revenues are allocated according to each company's provision of
2   services (i.e., Tufesa U.S.A.'s bus services in the United States and Autotransportes Tufesa's
3   bus services in Mexico).

4       A review of Plaintiff's response to Tufesa U.S.A.'s motion for summary judgment shows
5   that the decisive issue before the Court is whether Tufesa U.S.A. and Autotransportes Tufesa
6   were engaged in a joint venture such that Tufesa U.S.A. can be held jointly liable for the
7   actions of Autotransportes Tufesa.  Plaintiff's response does not address Tufesa's legal
8   arguments pertaining to Tufesa U.S.A.'s lack of duty to Plaintiff or the efficacy of holding
9   Tufesa U.S.A. liable for the acts of Autotransportes Tufesa based on a piercing of the
10  corporate veil, instrumentality, alter-ego, or unity of interest type theory.  Rather, Plaintiff
11  only specifically argues that Tufesa U.S.A. and Autotransportes Tufesa were engaged in a
12  joint venture to provide direct[2] bus service from numerous locations in Mexico to the United
13  States and direct bus service from numerous locations in the United States to Mexico; as this
14  joint venture led to Plaintiff's injuries, Plaintiff argues that Tufesa U.S.A. is jointly liable
15  with Autotransportes Tufesa.  Accordingly, in light of Plaintiff's response, the Court will
16  only address the joint venture issue as it pertains to Tufesa U.S.A.'s motion for summary
17  judgment.

18      Generally, there "must be some community of purpose to give rise to joint tort liability."
19  *Sparks v. Republic Nat'l Life Insurance Co.*, 132 Ariz. 529, 540 (1982).  "Vicarious liability
20  for concerted action may be found to exist when the tort-feasors have entered into a joint
21  enterprise or joint venture . . . Where a joint venture exists, each of the parties is the agent
22  of the others and each is likewise a principal so that the act of one is the act of all." *Id.*  "In
23  such a relationship, it may be said that the partners or persons engaged in the common
24  enterprise are subject to a common duty, the breach of which will subject those persons to
25  liability for the entire harm resulting from the failure to perform the duty." *Id.*

26  _____

27      [2]Direct inasmuch as the customer can buy one ticket from Mexico to Arizona (or vice versa)
    without having to get off the bus at the border, buy a new ticket, wait for another bus to arrive, and
28  then board a new bus to actually reach their international destination.

1     As a threshold matter, the Court notes that the parties disagree as to the essential elements

2     required to demonstrate a joint venture.  Initially, both parties cite to *Tanner Companies*

3     which lists the classic elements of a joint venture as "(1) a contract; (2) a common purpose;

4     (3) a community of interest; (4) an equal right to control; and (5) participation in the profits

5     and losses."  *Tanner Companies v. Superior Court*, 144 Ariz. 141, 143 (1985).  However,

6     Plaintiff subsequently cites *Farr* for the proposition that not all five elements of a joint

7     venture referenced in *Tanner Companies* must be shown to demonstrate joint venture liability

8     in Arizona; in *Farr*, a showing of an equal right to control and participation in profits and

9     losses was not required to show joint venture liability between an insurer and its claims

10    administrator.  *See Farr v. Transamerica Occidental Life Ins. Co. of California*, 145 Ariz.

11    1, 11 (Ct. App. 1984)("[The Arizona Supreme Court's decision in] *Sparks* turns upon the

12    idea that the insurer and its agent are engaged in a joint venture so that each is jointly and

13    severally liable with the other for a bad faith refusal to pay. Occidental . . . says that not all

14    the features of a joint venture are present here. Looking to those features, we note that here

15    there was no proof of profit and loss sharing and no proof of a joint right to control. Thus,

16    the classical elements of a joint venture are missing. But if that is true here, it was also true

17    in *Sparks*. In *Sparks* the court found that a company that issued certificates of coverage,

18    billed and collected premiums, handled the investigation and payment of claims, and

19    distributed brochures to induce the purchase of policies was engaged in a joint venture with

20    the insurer . . .").

21    Defendant argues, however, that all five elements listed in *Tanner Companies* must be

22    shown to demonstrate a joint venture in Arizona.  Defendant argues that the elements of joint

23    control and sharing in profits and losses were not required in *Farr* and *Sparks* due to the

24    unique insurer-claims administrator type relationship which has important public policy

25    implications for insureds which are not at issue in this case.  A review of *Sparks*, however,

26    does not show that the Court limited its analysis and holding pertaining to joint ventures to

27    the specific facts only in that case; rather, unlike *Tanner Companies*, *Sparks* simply listed

28    four (as opposed to five) requirements to show a joint venture: "A joint venture requires an

1   agreement, a common purpose, a community of interest, and an equal right to control."

2   *Sparks*, 132 Ariz. at 540.  After listing the requirements for a joint venture, the *Sparks* Court

3   concluded that there "can be no doubt that the business relationship entered into by [insurer

4   and its claims administrator] contained all of the essential elements of a joint venture, and

5   that any acts of [the insurer or its claims administrator] could be imputed to the other."  The

6   *Sparks* court never states that it waived the requirements of participation in profits and losses

7   or equal right to control because of the public policy implications involved with insurers and

8   their insureds in Arizona.  *Id.*  While equal right to control was listed as a requirement for a

9   joint venture in *Sparks*, the *Sparks* court never stated that participation in profits and losses

10  was a requirement for a joint venture and further found that a joint venture existed because

11  the "essential elements" of a joint venture were present even though there was no equal right

12  to control.  *Id.*; *Farr*, 145 Ariz. at 11.

13       A review of the relevant Arizona case law pertaining to joint ventures shows that there are

14  numerous cases listing only four required elements to establish a joint venture and none of

15  them list participation in profits and losses as a requirement; rather, a review of these cases

16  reflects the following four requirements: (1) a contract or agreement, (2) a common purpose,

17  (3) a community of interest, and (4) an equal right of control.  *See Sparks v. Republic Nat'l*

18  *Life Insurance Co.*, 132 Ariz. 529, 540 (1982)( "A joint venture requires an agreement, an

19  common purpose, a community of interest, and an equal right to control."); *Murry v. Western*

20  *American Mortgage Co.*, 124 Ariz. 387, 390 (Ct. App. 1980)( "[T]he essential elements of

21  a joint venture [are] an agreement, common purpose, a community of interest, and an equal

22  right of control."); *Jolly v. Kent Realty, Inc.*, 151 Ariz. 506, 513 n. 4 (Ct. App. 1986)("A joint

23  venture requires an agreement, a common purpose, a community of interest, and an equal

24  right to control."); *Nahom v. Blue Cross Blue Shield of Arizona*, 180 Ariz. 548, 558 (Ct. App.

25  1994)("To show a joint venture, [plaintiff] must show an agreement, a common purpose, a

26  community of interest and an equal right of control."); *Weller v. Hansen*, 21 Ariz. App. 217,

27  222 (Ct. App. 1973)("The elements of a joint venture are (1) a contract, (2) a common

28  purpose, (3) a community of interest, and (4) and equal right of control."); *Cothrun v.*

*Schwartz*, 156 Ariz. 459, 461 (Ct. App. 1988)(listing the required elements of a joint venture as "(1) a contract, (2) a common purpose, (3) a community of interest, and (4) and equal right of control."); *West v. Soto*, 85 Ariz. 255, 261 (1959)(same); *Mercer v. Vinson*, 85 Ariz. 280, 286 (1959); *Garcia v. City of South Tucson*, 131 Ariz. 315, 318 (1981)(same).  In light of the numerous Arizona cases cited above, it is clear that a joint venture can be demonstrated where there is a contract or agreement, a common purpose, a community of interest, and an equal right of control.  *See id.*  As such, the Court will focus on these factors in determining whether there is an issue of fact as to the existence of a joint venture in this case.

A review of Tufesa U.S.A.'s reply to Plaintiff's response in opposition to summary judgment reflects that Tufesa U.S.A. only specifically argues that a joint venture does not exist because an equal right to control and participation in profits and losses has not been demonstrated; Tufesa U.S.A's reply does not argue that a contract or agreement, a common purpose, or a community of interest has not been demonstrated and a review of the facts adduced by Plaintiff clearly shows an issue of fact as to these required elements.  As participation in profits and losses is not a requirement to show a joint venture in numerous Arizona cases as discussed above, the Court finds that Defendant's argument as to this issue is without merit.  Thus, the primary issue before the Court is whether there was an equal right to control between Tufesa U.S.A. and Autotransportes Tufesa.

As reflected below, taking the facts advanced by Plaintiff as true and drawing all reasonable inferences in her favor, there is an issue of fact as to all four requirements for a joint venture such that summary judgment must be denied.

Plaintiff argues that contrary to Tufesa U.S.A.'s assertions, the evidence it has introduced shows that Tufesa U.S.A. and Autotransportes Tufesa are not separate and independent corporations, but are intimately intertwined entities that work closely together to provide (and represent to consumers) convenient, direct bus service from Mexico to numerous locations in Arizona and other Southwestern states and convenient, direct bus service from Arizona and other Southwestern states to Mexico.

Since 1994, Autotransportes Tufesa has been offering bus transportation throughout Mexico.  Oscar Luna Fernandez ("Oscar") is the founder of  Autotransportes Tufesa, is its largest shareholder, and Oscar and his children own a controlling interest in Autotransportes Tufesa.  According to Autotransportes Tufesa, it is only a Mexican corporation and therefore does not have the ability to offer bus transportation in the United States.  Nonetheless, as stated on its website and as admitted by Autotransportes Tufesa's Secretary and General Manager, its "vision" has been to offer international bus transportation directly between Mexico and the United States (i.e., from Mexico to Arizona and other Southwestern states, and from Arizona and other Southwestern states to Mexico);  Autotransportes Tufesa is in the business of providing international bus transportation.  Oscar's son, Luis Alberto Luna Medina ("Luis"), is the Secretary and General Manager for Autotransportes Tufesa.  When asked about his duties as General Manager for Autotransportes Tufesa, Luis stated in his deposition: "Well, basically it would be managing and keeping control of our financial situation, human resources, fleet maintenance, bus business profitability, information systems control. And dealing, our relationship with all of our suppliers."  *See* Luis Deposition at 10.  Immediately thereafter, Luis was asked "You run the show?" and he responded "Something like that, right."  *See id.*

Subsequently, Luis was tasked with the duty of running a newly founded American bus transportation company which is Tufesa U.S.A which offers international bus transportation originating in the United States and continuing through Mexico.  Nine of the fifteen shareholders of Autotransportes Tufesa are also shareholders of Tufesa U.S.A.  Oscar, his son Luis, and Oscar's other children own approximately 40% of the shares in Tufesa U.S.A.  The shareholders, which includes Luis, receive dividends from their shares in Tufesa U.S.A.

The home office of Tufesa U.S.A. is based in Phoenix, Arizona and is incorporated in Arizona; Tufesa USA has approximately 35 employees whose tasks include  selling tickets, cleaning buses and following the directives of management.

As with Autotransportes Tufesa, Luis is also the General Manager of Tufesa U.S.A.  While Autotransportes Tufesa actually pays Luis a salary for the work he performs for

Autotransportes Tufesa, Tufesa U.S.A. does not pay Luis any salary for the work he performs as General Manager for Tufesa U.S.A.  He carries out his duties for Tufesa U.S.A. both in Autotransportes Tufesa's office in Obregon City, Sonora, Mexico, and also works out of Tufesa U.S.A.'s office in Phoenix, Arizona three to four days every few weeks.  As reflected in his deposition, Luis is the General Manager for Tufesa U.S.A. and his duties include: "Check in on day-to-day operations, day to day operations, management, and payment for services.  And seeking new markets, growth." *See* Luis Deposition at 7.  According to Luis' affidavit, he is the "sole manager" for Tufesa U.S.A.  *See* Luis Affidavit at ¶28 ("I am Tufesa's sole manager.").  Luis is responsible for making policy decisions for Tufesa U.S.A. which are then implemented by other employees of Tufesa U.S.A.  *See* Affidavit of Arturo Monje ("Part of my responsibilities . .  is implementation of the policy decisions made by . . . Luis.").[3]  When asked during his deposition: "So doesn't make sense that you are really an employee of Autotransportes Tufesa and you are paid by Autotransportes Tufesa to manage Tufesa USA?", Luis responded: "Well it would make sense to think like that." *See* Luis Deposition at 8-9.

To offer bus transportation services through Tufesa U.S.A., Luis decided to "lease" buses for Tufesa U.S.A.'s bus routes in Arizona and other Southwestern states.  Luis signed and entered into a "lease" agreement with Luis simultaneously as leasee and leasor for Tufesa U.S.A. and Autotransportes Tufesa.  Luis, on behalf of and as General Manager for Tufesa U.S.A., signed a master "lease" agreement as the "lessee" of buses effective November 14, 2004.  Likewise, Luis, on behalf of and as Secretary/General Manager of Autotransportes Tufesa again signed the "lease" agreement effective November 14, 2004 whereby

---

[3]The Court notes that Luis' affidavit states that he is the "sole manager" for Tufesa U.S.A., his deposition reflects that he is the General Manager for Tufesa U.S.A. in charge of day-to-day operations, and Monje's affidavit reflects that Luis sets policy for Tufesa U.S.A which Tufesa U.S.A. employees (i.e., Monje) implement; nonetheless, Monje's affidavit (which was submitted subsequent to Luis' affidavit and deposition with Tufesa's U.S.A.'s reply brief) curiously states that Monje is the General Manager of Tufesa U.S.A. and that Monje manages its daily operations which flatly contradicts Luis' earlier affidavit and deposition.

1    Autotransportes Tufesa was the "leasor" of buses to Tufesa U.S.A.  Tufesa U.S.A. only
2    "leases" buses from Autotransportes Tufesa.  The same law firm and respective attorneys
3    therefrom represented both Tufesa U.S.A. and Autotransportes Tufesa in regards to this
4    "lease" agreement.  The same law firm and respective attorneys therefrom continue to
5    represent both Tufesa U.S.A. and Autotransportes Tufesa.

6        According to this "lease" agreement, lessee Tufesa U.S.A. does not actually take physical
7    possession of buses for an extended and predetermined number of years, months or weeks
8    and render a fixed payment for buses to leasor Autotransportes Tufesa.  Rather, under this
9    special "lease" agreement, Tufesa U.S.A. and Autotransportes Tufesa are constantly using
10   the same buses during parallel time periods throughout the entire year.  The crossing of the
11   United States-Mexico border serves as the magic "being leased by Tufesa U.S.A. period of
12   time" versus "the bus is owned and operated by Autotransportes Tufesa period time."

13       The record demonstrates that the way it works in practice between Tufesa U.S.A. and
14   Autotransportes, for example, is that a customer in Mexico could purchase a ticket from
15   Autotransportes Tufesa for direct[4] bus service from Guadalajara to Tucson; customers do not
16   have to purchase a separate ticket for the U.S. portion of the trip.  The  customer boards the
17   Autotransportes Tufesa bus in Guadalajara en route to Tucson.  Immediately before the
18   Autotransportes Tufesa bus crosses the United States border, a Tufesa U.S.A. bus driver gets
19   on Autotransportes Tufesa's bus, takes the drivers seat, and a Autotransportes Tufesa bus
20   driver takes a seat as a passenger.  Both the Tufesa U.S.A. bus driver and Autotransportes
21   bus driver have the same uniforms and customers would not be able to tell that they work for
22   supposedly different companies based on these identical uniforms unless the customer
23   examined the driver's identification badge.  Luis purchases these identical uniforms for the
24   bus drivers for both Tufesa U.S.A. and Autotransportes Tufesa.  As the Tufesa U.S.A. driver
25   inches the nose of Autotranportes Tufesa's bus across the United States border (while the

26   _____

27       [4]The bus trip is direct inasmuch as the customer can buy one ticket from Mexico to Arizona
     (or vice versa) without having to get off the bus at the border, buy a new ticket, wait for another bus
28   to arrive, and then board a new bus to actually reach their international destination.

Autotransportes Tufesa driver now watches as a passenger), the bus suddenly[5] becomes a bus that is "leased" by Tufesa U.S.A. and driven by a Tufesa U.S.A. employee.  Despite the sudden "lease" to Tufesa U.S.A. that happens as the bus crosses the border, an Autotranportes Tufesa bus driver remains on the bus until the bus reaches its United States destination-Tucson; it appears that this Autotranportes Tufesa bus driver that remains as a passenger on Tufesa U.S.A.'s "leased" bus gets a free ride in the United States as he apparently does not buy a ticket from Tufesa U.S.A. for his time as a passenger in the United States portion of the bus trip.  Likewise, if a customer was to buy a ticket from Tufesa U.S.A. for direct bus service from Tucson to Guadalajara, the same situation would occur. Shortly before the bus reaches the Mexico border, an Autotransportes Tufesa bus driver rises from the seated passenger position, takes the still-warm driver's seat of Tufesa U.S.A.'s recently departed bus driver, and completes the bus journey to Guadalajara; the customer does not have to purchase a separate ticket for the portion of the trip in Mexico.  As soon as the bus crosses the Mexico border the bus is no longer considered "leased" by Tufesa U.S.A. and is simply owned and operated by Autotransportes Tufesa once again while in Mexico. At the time of purchase from either company, it appears to the customer that it is a direct bus ride (from Mexico to the U.S. or from the U.S. to Mexico) to a specific destination by one company; it does not appear to the customer that a different bus company with a different bus driver will take over a portion of the trip.[6]

---

[5]It is unclear whether the entire bus becomes "leased" by Tufesa USA as soon as the  nose of the bus inches across the border, or only the physical portion of the bus that actually crosses the border becomes leased (i.e., the rear portion of the bus may remain "owned" by Autotransportes Tufesa at the same time the front portion of the bus that is inching across the border is "leased" by Tufesa USA).  Thus, if there happens to be an accident right at border crossing where half of the bus is in Mexico and half of the bus is in the United States this could present a real dilemma as to who the respective companies would claim is responsible.

[6]Plaintiff points out that buses arriving from Mexico into the U.S. are fueled up by Tufesa U.S.A. at its expense and that the costs of fuel are later calculated and divided between fuel used by Tufesa U.S.A. in the U.S. and fuel used by Autotransportes Tufesa in Mexico; Luis along with two others from Autotransportes Tufesa play a role in determining how much Tufesa U.S.A. is paid for fuel.  Plaintiff also argues that Autotransportes Tufesa essentially pays taxes in the U.S.; for

As stated above, under the "lease"[7] agreement, Tufesa does not pay any set sum for the privilege of solely controlling the vehicles for any extended period of time; rather, the "rental amount" for Tufesa USA "leasing" Autotranportes Tufesa's buses appears to be "10% of total gross sales" between locations in Arizona and other Southwestern States. *See* Lease Agreement (Exhibit A-7 to Agreement). Thus, if sales of bus tickets made by Tufesa USA increase, Autotransportes Tufesa receives more money; if sales by Tufesa USA decrease, Autotransportes Tufesa receives less money.

Autotransportes Tufesa and Tufesa USA share the exact same website. As reflected on their joint website, the companies are not listed as two distinct entities of "Autotransportes Tufesa" and "Tufesa USA"  Rather, the website reflects one unified company. It reflects one company listed only as "Tufesa" in large, bold letters. The logo is identical for both companies, and it also states in large, bold letters that "Tufesa" is "The strongest line in northwestern Mexico and southern United [S]tates." In describing the "Tufesa" company, the website constantly lists only "Tufesa's" vision, services, bus routes, etc.; all of the advertising, text, and discussion on the website reflects one unified company of "Tufesa."

---

example, tax form 1042-S for year 2007 shows that Tufesa USA sent $123,000 to Autotransportes Tufesa, but withheld $37,000 for taxes. The withheld money was deposited with the U.S. Treasury, but Autotransportes Tufesa filed no tax return such that it essentially waived its claim for a refund of $37,000. Autotransportes did the same in 2006 whereby it essentially waived a refund of $32,000 stemming from funds Tufesa USA withheld from an approximately $106,000 payment made to Autotransportes Tufesa.

[7]It is unclear from the record whether Luis on behalf of Tufesa USA evaluated whether the "lease" agreement with Autotransportes Tufesa was the best business move for Tufesa USA in his role as General Manager.  For example, it is unclear whether Luis ever spoke with dealerships or manufacturers about purchasing (in bulk or otherwise) a fleet of buses for Tufesa USA's exclusive use and whether this was a more economical and profitable option for Tufesa USA.  It is also unclear whether Luis, on behalf of Tufesa USA, ever spoke with other companies (other than Autotransportes Tufesa) about lease terms for buses and used these quoted lease terms as a bargaining chip with Autotransportes Tufesa to obtain more favorable lease terms; as Luis ultimately signed as "leasee" for Tufesa USA and signed as "leasor" for Autotransportes Tufesa it is unclear how these negotiations would proceed.  Likewise, it is unclear from the record whether Luis on behalf of Autotransportes Tufesa evaluated whether the "lease" agreement with Tufesa USA was the best business move for Autotransportes Tufesa  in his role as General Manager.

*See* "Tufesa" Website ("Tufesa is a transport company that possesses modern buses, highly qualified personnel, technology . . . and advanced computer . . . systems; making Tufesa the leader . . . in autotransport . . ."; ". . . Tufesa . . . want[s] to become an enterprise group . . . able to influence national[ly] and internationally"; "[At] Tufesa we have the commitment to transmit the following values within our . . . organization . . ."; "[At] Tufesa we offer an excellent Package and Delivery Service"; "Tufesa's standard class, is available in all our branches"; "Tufesa Direct service . . ."). When Luis was asked during his deposition about the statement on the website regarding the vision to influence internationally, Luis stated that the goal was to "provide our services beyond Mexico's border's," and he admitted that goal has been achieved as they offer bus services to Tucson, Phoenix, Las Vegas, and Los Angeles. The website also states that bus service is also offered to numerous other destinations in the United States including: "Hungtington Park . . . Ontario, Colton, Bakersfield, Fresno, Merced, Modesto, Sacramento, Stockton." It also appears that tickets for the various destinations can be purchased from "Tufesa" on the joint website.

In light of the foregoing, a reasonable jury could find the essential elements of a joint venture in this case: a contract or agreement, a common purpose, a community of interest, and an equal right of control. As referenced earlier in this Order, Defendant specifically disputes that an equal right of control is present in this case.[8] In addressing the "equal right

---

[8]As noted earlier, Tufesa USA also specifically disputed that participation in profits and losses was present in this case. The Court has already found, based on numerous cases in Arizona, that participation in profits and losses is not required to show a joint venture. However, even if it was required, the facts discussed in this Order nonetheless reflect that a reasonable jury could find this element was present in this case. A reasonable jury could find that profits and losses were shared via the "lease" agreement whereby Autotransportes Tufesa was supposedly paid "rent" by receiving 10% of Tufesa USA's total gross sales for bus transportation in the U.S. A reasonable jury could also find participation in profits and losses via Tufesa USA's and Autotransportes Tufesa's closely intertwined relationship whereby they are represented to customers as a unified entity such that they can offer direct bus transportation whereby a customer can buy one ticket taking him from locations in Mexico all the way to locations in the U.S and from locations in the U.S. all the way to Mexico without having to inconveniently stop, get off a bus, buy a new bus ticket at the border with a separate transportation company, wait for a new bus to arrive, then board the bus. A reasonable jury could find that the profits of Tufesa USA and Autotransportes Tufesa have jointly increased due to this very valuable, added convenience for customers who might otherwise forgo such trips

1   to control element," Arizona courts have recognized that "joint ownership of property is not

2   necessary to establish an equal right of control" and that the "requisite of equality in joint

3   control does not render impossible the delegation of the duties of management to one of the

4   participants in a joint venture. The rights of the parties with respect to the management and

5   control of the enterprise may be fixed by agreement so as to effectively place control in the

6   hands of one of the joint venturers . . ." *See Ellingson v. Sloan*, 22 Ariz.App. 383, 386 and

7   387 n. 1 (1974)(internal quotes and citations omitted); *see also Continental Casualty Co. v.*

8   *Signal Insurance Co*, 119 Ariz. 234, 237 (Ct. App. 1978)(same).  The Arizona Supreme

9   Court has stated that "[w]hile the 'equal right to control' element of a joint venture could

10  imply that each venturer must have an equivalent amount of control over the venture's

11  operation, we believe it is more accurate to say that each joint venturer must share, to some

12  extent, in the control of the venture. In other words, it is sufficient that a venturer has some

13  voice or right to be heard in the control and management of the venture."   *Estate of*

14

---

15  or choose an alternative vendor or other means of transportation between the U.S. and Mexico.  The
16  Court notes that there are courts that have recognized that the "mutual benefit" flowing from a joint
    venture can replace the classic requirement of sharing in profits.  *See Transport Indemnity Co. v.*
17  *Liberty Mutual Insurance Co.*, 620 F.2d 1368, 1370-71 (9th Cir. 1980).  In addition, the Court notes
    that courts have found the sharing of profits (even though not required) in relation to a joint venture
18  on facts much less indicative of a joint venture as compared to this case.  For example, in *Mercer*
    *v. Vinson*, Mr. Rima happened to own a  trailer home park and Mr. Vinson happened to own a trailer
19  home.  *See* 85 Ariz. 280 , 283,  286-88 (1959).  Vinson was away most of the year, so Vinson
20  approached Rima (they did not know each other previously) about parking his trailer at his trailer
    park while he was away and renting out his vacant trailer to someone while it was parked in Rima's
21  trailer park. *Id.*  Rima's standard rate for parking trailers was $18.36 a month and Vinson intended
    to pocket $25 a month from any renter of his trailer home. *Id.*  Vinson found a young couple that
22  would rent his trailer home and charged them $43.36 a month ($25 for Vinson to pocket and $18.36
    to cover Rima's standard monthly fee). *Id.*  Each month, Rima would collect $43.36 from the couple,
23  keep $18.36 for monthly parking and send the remaining $25 to Vinson as they previously agreed.
24  *Id.* Unfortunately, due to the improper installation of an unvented heater in the trailer home by the
    manufacturer, there was a gas leak that caused the death of the couple renting the trailer home. *Id.*
25  The administrator of the estate sued both Vinson and Rima alleging a joint venture, and the Arizona
    Supreme Court found that a reasonable jury could find that Rima and Vinson were "two individuals
26  associating themselves together and pooling their mutual resources for their mutual betterment, a
    profit.  Both assumed the risk of no profit in the event the enterprise was unsuccessful.  We do not
27  think it impossible for reasonable men to come to an honest conclusion that the facts as here outlined
28  establish a joint enterprise or adventure." *Id.* at 288.

*Hernandez by Hernandez-Wheeler v. Flavio*, 187 Ariz. 506, 510 (1997).  Based on all the evidence before the Court, as discussed throughout this Order, a reasonable jury could also find that there was an "equal right to control" under the circumstances of this case.  For example, a reasonable jury could find that there was "equal control" between the joint venturers via Luis as he is in fact the "control" person controlling both corporations in his dual role as General Manager for both Tufesa USA and Autotransportes Tufesa.  As referenced earlier in this Order, when asked about his duties as General Manager for Autotransportes Tufesa, Luis stated in his deposition: "Well, basically it would be managing and keeping control of our financial situation, human resources, fleet maintenance, bus business profitability, information systems control. And dealing, our relationship with all of our suppliers." *See* Luis Deposition at 10.  Immediately thereafter, Luis was asked "You run the show?" and he responded "Something like that, right." *See id.* As reflected in his deposition, Luis' duties as General Manager for Tufesa USA include: "Check in on day-to-day operations, day to day operations, management, and payment for services.  And seeking new markets, growth." *See* Luis Deposition at 7.  According to Luis' affidavit, he is the "sole manager" for Tufesa U.S.A.  *See* Luis Affidavit at ¶28 ("I am Tufesa's sole manager.").  In addition, Luis is responsible for making policy decisions for Tufesa U.S.A. which are then implemented by other employees of Tufesa U.S.A.  *See* Affidavit of Arturo Monje ("Part of my responsibilities . . .  is implementation of the policy decisions made by . . . Luis.").  A reasonable jury could find that Luis in fact "runs the show" simultaneously for both Tufesa USA and Autotransportes Tufesa.   In light of the symbiotic relationship between Autotransportes Tufesa and Tufesa USA as borne out by all the evidence before the Court, and in light of the responsibilities and power Luis wields over both corporations simultaneously, a reasonable jury could find "equal control" and that a joint venture exists between Tufesa USA and Autotransportes Tufesa.

Accordingly, Tufesa USA's motion for summary judgment is denied.

1    **AUTOTRANSPORTES TUFESA'S MOTION TO DISMISS**

2    Autotransportes Tufesa has filed a related motion to dismiss for lack of personal

3    jurisdiction arguing that it is a wholly separate corporation from Tufesa USA and as such it

4    has absolutely no contacts with Arizona such that personal jurisdiction in this forum is

5    prohibited.  The issues pertaining to the motion to dismiss for lack of jurisdiction closely

6    overlap with the facts and issues already discussed in detail above; as such, outside of setting

7    forth the relevant legal standards to be applied, the Court's remaining discussion will be quite

8    brief.

9    Plaintiff has the burden of establishing personal jurisdiction.  *See Flynt Distrib. Co., Inc.*

10   *v. Harvey*, 734 F.2d 1389, 1392 (9th Cir. 1984).  Plaintiff need only make a prima facie

11   showing of personal jurisdiction for the motion to dismiss to be denied; Plaintiff's facts are

12   taken as true and all inferences are drawn in her favor.  *See Mattel, Inc. v. Greiner and*

13   *Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003).   Because Plaintiff is asserting that

14   Arizona has personal jurisdiction over Defendants, Arizona law governs.  *See Brainerd v.*

15   *Governors of the University of Alberta*, 873 F.2d 1257, 1258 (9th Cir. 1989).  Arizona's long

16   arm statute permits personal jurisdiction to the full extent allowable under the due process

17   clause of the U.S. Constitution.  *See id.*   Thus, the Court need only determine whether the

18   assertion of personal jurisdiction over Defendants is consistent with the requirements of due

19   process.  *See id.*  "For a court to exercise personal jurisdiction over a nonresident defendant,

20   that defendant must have at least minimum contacts with the relevant forum such that the

21   exercise of jurisdiction does not offend traditional notions of fair play and substantial justice

22   . . . There are two forms of personal jurisdiction that a forum state may exercise over a

23   nonresident defendant-general jurisdiction and specific jurisdiction."  *Boschetto v. Hansing*,

24   539 F.3d 1011, 1016-17 (9th Cir. 2008)(internal quotes and citations omitted).  "A defendant

25   whose contacts with a state are substantial or continuous and systematic can be haled into

26   court in that state in any action, even if the action is unrelated to those contacts . . . This is

27   known as general jurisdiction. The standard for establishing general jurisdiction . . . requires

28   that the defendant's contacts be of the sort that approximate physical presence . . .  Factors

to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000)(internal quotes and citations omitted).  Specific jurisdiction can be established if three requirements are satisfied: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws[9]; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities[10]; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."[11] *Menken v. Emm*, 503 F.3d 1050, 1057

---

[9]The Ninth Circuit has "typically treated purposeful availment somewhat differently in tort and contract cases. In tort cases, we typically inquire whether a defendant purposefully directs his activities at the forum state, applying an effects test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum . . . [Under the effects test] the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state . . . In a specific jurisdiction inquiry, [the Ninth Circuit] consider[s] the extent of the defendant's contacts with the forum and the degree to which the plaintiff's suit is related to those contacts. A strong showing on one axis will permit a lesser showing on the other. A single forum state contact can support jurisdiction if the cause of action arises out of that particular purposeful contact of the defendant with the forum state." *Id.* at 1057-58 (internal quotes and citations omitted). "Physical contact with the forum state is not a necessary condition, within the rubric of purposeful availment, the [Supreme] Court has allowed the exercise of jurisdiction over a defendant whose only contact with the forum state is the purposeful direction of a foreign act having effect in the forum state." *Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2003)(internal quotes and citations omitted).

[10]In determining whether [plaintiff's] claims arise out of [defendant's] forum-related conduct, the Ninth Circuit follows the but for test . . . Hence, [plaintiff] must show that he would not have suffered an injury but for [defendant's] forum-related conduct. *Id.* at 1058 (internal quotes and citations omitted).

[11]The Ninth Circuit considers the following seven factors in determining whether the exercise of jurisdiction is reasonable: "(1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating

1  (9th Cir. 2007)(internal quotes and citations omitted).  "The plaintiff bears the burden of

2  satisfying the first two prongs of the test. If the plaintiff fails to satisfy either of these prongs,

3  personal jurisdiction is not established in the forum state . . . On the other hand, if the

4  plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the

5  defendant to present a compelling case that the exercise of jurisdiction would not be

6  reasonable." *Id.* (internal quotes and citations omitted).

7      As referenced above, the Court's remaining discussion pertaining to the motion to dismiss

8  shall be brief as the Court has already ruled that Plaintiff has established a prima facie case

9  pertaining to a joint venture between Autotranportes Tufesa and Tufesa USA (an Arizona

10  corporation with 35 employees whose home office is in Arizona) whose symbiotic

11  relationship allows them to work closely together to provide (and represent to consumers)

12  convenient, direct bus service from Mexico to numerous locations in Arizona and other

13  Southwestern states and convenient, direct bus service from Arizona and other Southwestern

14  states to Mexico.  As there is an abundance of persuasive authority holding that the contacts

15  with the forum state of one co-joint venturer may be imputed to the other co-joint venturer

16  for purposes of establishing personal jurisdiction in the forum, the Court is likewise imputing

17  the contacts with Arizona between co-venturers Tufesa USA and Autotransportes Tufesa

18  such that the Court finds that personal jurisdiction over Autotranportes Tufesa is appropriate

19  under the totality of the circumstances in this case as discussed earlier in the Order.  *See*, *e.g.*,

20  *Hill v. Shell Oil Company*, 149 F.Supp.2d 416, 418 (N.D. Ill. 2001)("The joint venture . . .

21  provides that the minimum contacts of one co-venturer are attributable to other co-venturers

22

---

23  the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the
    forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an

24  alternative forum." *Id.* at 1058 (internal quotes and citations omitted).  "No one of the factors is
    dispositive in itself.  Instead, we are to balance all seven." *Harris Rutsky & Co. Ins. Services, Inc.*,

25  328 F.3d at 1132.  The Ninth Circuit has also noted that "modern advances in communications and
    transportation have significantly reduced the burden of litigating in another country" which has

26  lessened the weight given to factors (2) and (5), and that "[states] maintain a strong interest in
    providing an effective means of redress for its residents [who are] tortiously injured", *Id.* at 1133

27  (internal quotes and citations omitted).

28

such that personal jurisdiction over one means personal jurisdiction over all.  Because there

was enough evidence to suggest that [defendants] Shell, Equilon and Motiva were engaged

in a joint venture . . . we concluded that Motiva could not be dismissed from this lawsuit

given the sufficient Illinois contacts of Shell and Equilon."); *Bonney v. Roelle*, 117 F.3d

1413, 1997 WL 407831, *8 (4th Cir. 1997)("Even when an action does not arise out of the

non-resident defendant's contact with the forum state, the exercise of personal jurisdiction

is proper if the non-resident defendant has had continuous and systematic contact with the

forum state . . .This is known as general jurisdiction . . . Applying these principles with

respect to SAZ and SAZ Dialog [German corporations], we conclude the district court

possessed at least general jurisdiction over them. HVB had continuous and systematic contact

with Virginia by virtue of its being headquartered in Virginia during the last year of the joint

venture. Under our circuit precedent and common law principles governing joint ventures,

such contact is attributable to SAZ and SAZ Dialog by virtue of SAZ and SAZ Dialog being

joint venturers with HVB . . . Thus, regardless of whether this action actually arose out of

SAZ and SAZ Dialog's contacts with Virginia, they had sufficient minimum contacts with

Virginia such that requiring them to defend their interests in Virginia does not "offend

'traditional notions of fair play and substantial justice . . . Accordingly, we hold the district

court properly concluded that the default judgment against SAZ and SAZ Dialog was not

void for lack of personal jurisdiction.")(unpublished disposition); *ABB Daimler-Benz*

*Transportation (North America, Inc. v. National Railroad Passenger Corp.*, 14 F.Supp.2d

75, 87 (D.D.C. 1998)("As joint venturers the action of one is attributed to the other.  Thus,

the actions of Amtrak in D.C. are imputed to NJT, and as such, NJT is subject to personal

jurisdiction in this forum . . .");  *Bensmiller v. E.I. Dupont Nemours & Co.*, 47 F.3d 79, 81

(2nd Cir. 1995)(recognizing that the forum contacts of one co-venturer can be attributed to

the other co-venturer for the purpose of establishing personal jurisdiction); *Daynard v. Ness,*

*Motley, Loadhold, Richardson & Poole, P.A.*, 290 F.3d 42, 54, 57 (1st Cir. 2002)("We

conclude that, similar to some cases involving actual partnerships, the relationship between

the defendants here invokes certain principles of the law of agency, partnership and joint

1    venture and that these principles permit imputing contacts . . . We think it consistent with the

2    Due Process Clause to attribute to the Scruggs defendants the Motley defendants' retention

3    of, and certain interactions with, [plaintiff] Daynard where, as Daynard alleges, they have

4    led Daynard and the public to believe they were joint venturers . . . Even if the [defendants]

5    were not joint venturers, they held themselves out to Daynard to be part of a joint venture .

6    . . and are subject, for personal jurisdiction purposes, to the doctrine of estoppel."); *Anderson*

7    *v. Dassault Aviation*, 361 F.3d 449 (8th Cir. 2004)(Michigan resident was injured in a plane

8    manufactured by a French corporation in Michigan and brought suit in Arkansas where a

9    subsidiary was located; although the court did not specifically find that the corporate veil

10   could be pierced via an alter ego relationship, the court imputed the contacts of the Arkansas

11   subsidiary to the French parent corporation such that the assertion of personal jurisdiction

12   was proper in Arkansas in light of the symbiotic relationship of the two companies);

13   *Administrators of the Tulane Educational Fund v. Debio Holding S.A.*, 2000 WL 877015, *3

14   (E.D. La. 2000)("It has routinely been held that whenever one co-venturer acts in the forum

15   to further the interests of the venture, its contacts with the forum are attributed to the co-

16   venturers . . . Thus, when the activities of one co-venturer in the forum are sufficient to

17   sustain the exercise of personal jurisdiction, jurisdiction will attach as to all participants in

18   the venture."); *Glenwood Farms Inc. v. Ivey*, 335 F.Supp.2d 133, 141 (D. Me. 2004)("[T]he

19   contacts of either [joint venturer] in furtherance of the joint venture may be imputed to the

20   other members of the joint venture for purposes of determining related contacts with the

21   forum).

22        In light of the foregoing, Autotransportes Tufesa's motion to dismiss for lack of personal

23   jurisdiction is denied.

24

25

26

27

28

1    **CONCLUSION**

2        Accordingly, **IT IS HEREBY ORDERED** as follows:

3    (1) Tufesa USA's motion for summary judgment is denied and Autotransportes Tufesa's

4    motion to dismiss for lack of personal jurisdiction is denied.[12]

5

6        DATED this 11th day of February, 2009.

7

8

9

10

11       FRANK R. ZAPATA
         United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25
─────────────────────
26       [12]The Court notes that Plaintiff previously filed a Rule 56(f) motion to allow relevant
     discovery prior to ruling on the motion for summary judgment and motion to dismiss such that
27   Plaintiff could have a fair opportunity to oppose the motions.  Subsequent to filing this motion, the
     parties stipulated that discovery pertaining to these motions was proper and Plaintiff engaged in
28   relevant discovery.  As such, the Rule 56(f) motion is moot and shall be denied as moot.